IVAN STEPHAN FISHER
ATTORNEY AT LAW
251 EAST 61ST STREET
NEW YORK, NEW YORK 10021

Tel.: (212) 517-5000
Fax: (212) 486-7701

January 28, 2008

**By ECF**

Honorable Laura Taylor Swain
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   United States v. Noorzai
       05 Cr. 19 (LTS)

Dear Judge Swain:

   We are writing, on behalf of defendant Bashir Noorzai, in response to the sur-reply papers submitted by the government in opposition to our omnibus pretrial motion. Although the government's latest papers reflect a shift in tactics – no longer relying on the claim that the promises alleged by Noorzai were "unauthorized," but accepting for purposes of this motion the "assumption" that those promises were in fact authorized by government officials – the one thing that has remained consistent in the government's response to our motion is a determined effort, by whatever means possible, to avoid an evidentiary hearing and the disclosures concerning the knowledge and participation of high-level government officials and agencies in the methods used to induce Noorzai to travel to the United States and speak with federal agents that would accompany such a hearing.

   In view of the facts the government no longer disputes, however, this Court should recognize that Noorzai is entitled to relief based on the promises that were authorized and/or ratified by government authorities.  Moreover, particularly in view of the additional facts submitted as an offer of proof in the accompanying affirmation of counsel

Honorable Laura Taylor Swain
January 28, 2008
Page 2

for Mr. Noorzai and affidavits of Michael Patrick Jost, this Court should conclude that the *Ker-Frisbie* doctrine does not insulate the government from an inquiry into the methods it utilized in the instigation and prosecution of the present case, nor does it dispense with the need for this Court to determine whether those methods so shock its conscience that it should not permit the United States District Court for the Southern District of New York to tarnish itself by becoming an accessory to proceedings in which the government has resorted to such methods.

As we will demonstrate, the present indictment should be dismissed not only for the reasons we have previously argued, but also, as an exercise of the Court's inherent supervisory authority, to sanction the government for audaciously making false statements to the Court itself during the course of the present proceedings. We will also show that the government misreads controlling precedent when it argues that Noorzai knowingly and intelligently waived his right to counsel even though the government not only concealed from him the fact that he was under indictment, but deceived him into believing that the government's posture toward him was entirely non-adversarial. Finally, we will show that the government's claim that Noorzai "spontaneously" reinitiated discussions with his interrogators after becoming aware of his indictment cannot be resolved without a hearing.

A.    **Because the Government Is Bound by Its Promises of "Safe Passage," Noorzai Should Be Released from Custody**

Seizing on Noorzai's "clarification" that he was not promised "immunity," the government endeavors to shift the question pertinent to the present motion from whether the government should be bound by its promises to the entirely different question whether the manner in which Noorzai was brought within this court's jurisdiction bars his prosecution. It thus dwells at length on cases decided under *Ker v. Illinois*, 119 U.S. 436 (1886), and *Frisbie v. Collins*, 342 U.S. 519(1952) (the "*Ker-Frisbie* doctrine") that stand for the proposition that an indictment need not be dismissed simply because of illegality, fraud, or other misconduct in the methods by which a defendant was brought within the jurisdiction of the court. *See* Government's Sur-reply Memorandum (hereinafter, "GM"), pp. 3-19. Even assuming, *arguendo*, that this case did not entail a level of governmental misconduct so outrageous that it warrants dismissal notwithstanding the *Ker-Frisbie* doctrine, *but see* Section B, *infra*, those cases do not negate the principal, discussed at length in our prior submissions, that the government is bound by promises that it makes or ratifies. *See, e.g., United States v. Flemmi*, 225 F.3d 78, 88-90 (1st Cir. 2000).

Honorable Laura Taylor Swain
January 28, 2008
Page 3

The government now "assumes the truth of Noorzai's factual allegations regarding the alleged assurances that were made to him and the purported authority of the individuals who extended those assurances." GM, p.1. Moreover, even in the factual assertions that it continues to make, the government implicitly acknowledges that it was aware of its agents' promises of "safe passage," but did nothing to repudiate those promises. Thus, the government states that:

> . . . after prosecutors learned that assurances of safe passage were communicated in contemplation of earlier meetings outside the United States, prosecutors gave specific instructions that no one should make any such assurance to Noorzai or anyone associated with him in connection with his travel to the United States in April 2005.

GM, pp. 5-6. Giving instructions to provide no *additional* assurances *in the future* is a far cry from repudiating the promises that, as the government now admits, it "learned" had already been made. Thus, it is clear that the government, which took full advantage of Noorzai's travel to the United States and agreement to meet with federal agents in reliance on those past promises, ratified those promises. *See Flemmi*, 225 F.3d at 90 (implied ratification occurs when "the ratifying official knows of the agreement, fails to repudiate it in a timely manner, and accepts benefits under it").

Accordingly, whether or not its conduct requires dismissal of the indictment, the government is unquestionably bound by the promises of "safe passage" that were made to Noorzai. Those promises comprise an assurance that Noorzai would be permitted to leave the United States after meeting with government officials. Accordingly, the Court should ensure that the government makes good on that promise by directing that Noorzai immediately be released from custody and that he be permitted to leave this country.

**B.    In View of the Outrageous Conduct of Government Officials, Both in Luring Noorzai to the United States and in the Litigation of the Present Motion, the Indictment Should Be Dismissed**

As the prosecution acknowledges, the *Ker-Frisbie* doctrine does not provide a *carte blanche* by which the government can avoid "judicial scrutiny of conduct of the most outrageous and reprehensible kind by United States government agents." GM, p. 10, quoting *United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 65 (2d Cir. 1975).

Honorable Laura Taylor Swain
January 28, 2008
Page 4

Rather, as the Second Circuit held in *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974), notwithstanding that doctrine, there may still be circumstances in which "'the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction . . . .'" *Id.* at 274, quoting *United States v. Russell*, 411 U.S. 423, 431-432 (1973). Although the government argues that the exception to the *Ker-Frisbie* doctrine recognized in *Toscanino* should be limited to the facts of that case, in which federal agents engaged in acts of brutality and torture, full consideration of the conduct that the government engaged in or endorsed in the present case – not only in its efforts to lure Noorzai to this jurisdiction, but also in its presentation of facts to the Court in connection with the present motion – should outrage this Court no less than the conduct decried in *Toscanino*.

As discussed in the accompanying affidavit and affirmation, we anticipate that the evidence at a hearing will establish not only that agents acting under the authority of officials at high levels of the United States government made promises and false representations in order to induce Noorzai to come to the United States, but that, in their efforts to gain access to Noorzai, they engaged in serious *criminal* activity: bribing foreign officials and other intermediaries with funds provided to them by government authorities expressly for that purpose. In conjunction with those efforts, the agents deliberately concealed the fact that Noorzai had been indicted, and thus compromised his ability to make an informed decision to exercise his Sixth Amendment right to counsel. Perhaps even more disturbingly, evidence will be presented to show that, in connection with its litigation of the present motion, the government has made false declarations to this very Court. Specifically, a hearing will establish that Assistant United States Attorney Boyd Johnson, III represented to this Court that "Mike" and "Brian" acted without the knowledge and authorization of government officials, even though Mr. Johnson well knew that the interactions between Noorzai and those agents were part of a clandestine program initiated at the highest levels of the Department of Defense and the Department of Justice, and that government officials knew of and authorized the actions they performed on behalf of the United States government. The government also presented to this Court an affidavit in which DEA Special Agent Patrick Hamlette falsely swore to the same assertions. Such conduct by a representative of the United States Attorney's Office and a Special Agent of the DEA, in conjunction with the deceptive, manipulative, and criminal conduct that preceded it, should surely "shock the conscience" of this Court and offend its "sense of justice." *Lujan*, 510 F.2d at 65, quoting *Rochin v. California*, 342 U.S. 165, 172-73 (1952).

Honorable Laura Taylor Swain
January 28, 2008
Page 5

Thus, notwithstanding the *Ker-Frisbie* doctrine, the outrageous misconduct engaged in by the government in the present case is not beyond the reach of judicial scrutiny. On the contrary, after a hearing, this Court should conclude that this case involves the exceptional level of impropriety under which the principles of due process require dismissal of the indictment. Moreover, even in the absence of a determination that dismissal is constitutionally mandated, "the Supreme Court has made it clear that Federal courts do have supervisory authority . . . over the manner in which Federal agents exercise their powers." *United States v. Parrott*, 248 F.Supp. 196 (D.D.C.1965).  *See United States v. Williams*, 504 U.S. 36 (1992); *Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988); *United States v. Brito*, 907 F.2d 392 (2d Cir.1990)(recognizing that district courts have supervisory authority to dismiss an indictment because of governmental misconduct). As the Court of Appeals recognized in *United States v. Hammad*, 858 F.2d 834, 837 (2d Cir.1988), *reconsideration declined*, 902 F.2d 1062, 1063-64 (2d Cir.), *cert. denied*, 498 U.S. 871 (1990), "[t]he federal courts enforce professional responsibility standards pursuant to their general supervisory authority over members of the bar." The extraordinary facts underlying the present motion require full development at an evidentiary hearing so that this Court can determine whether it would offend due process for the processes of the federal judiciary to be utilized in the present prosecution, or whether this prosecution should be barred as an exercise of the Court's supervisory authority.

**C.    Because Noorzai Was Not Aware of Information That Was Essential to Making an Informed Decision, His Purported Post-Indictment Waiver of the Right to Counsel Could Not have been Knowing and Intelligent**

As discussed in our reply letter, and acknowledged in the government's sur-reply, the Court of Appeals held in *United States v. Charria*, 919 F.2d 842 (2d Cir. 1990), that:

> *Once an accused understands that he is under arrest* and, after receiving the *Miranda* warnings, understands his right to remain silent, the potential consequences of speaking, and his right to counsel, including during interrogation, he is fully apprised of the information needed to make a knowing waiver of the sixth amendment right . . . .

919 F.2d at 848 (emphasis added). The government does not contend that Noorzai understood that he was under arrest during the 11-day period when he was questioned at

Honorable Laura Taylor Swain
January 28, 2008
Page 6

the Embassy Suites Hotel; indeed, it does not dispute our contention that government agents deliberately deceived him into believing that this was not the case. Instead, it bases its argument on the stunning theory that the highlighted words in the above passage from *Charria* were entirely gratuitous; according to the government, what the Court of Appeals meant by the language quoted above was, in essence, that, *whether or not* a defendant understands that he is under arrest, the administering of *Miranda* warnings is sufficient to apprise him of all of the information essential to a knowing waiver. In other words, the government argues that what the Court of Appeals *meant* was the precise opposite of what it *said*. Unless this Court is prepared to join the government in ignoring the plain language of the Court of Appeals' opinion in *Charria*, or turning that language on its head, it should reject the government's argument.

In keeping with its effort to read the reference to an understanding "that he is under arrest" out of the Court of Appeals' discussion of the circumstances under which a defendant may be considered "fully apprised" of the information essential to a knowing waiver, the government also fails to note that, just before the passage containing that reference, the Court had quoted the Supreme Court's explanation that a Sixth Amendment waiver analysis requires "practical inquiry" into:

> what purposes a lawyer can serve at the particular stage of the proceedings in question and what assistance he could provide to an accused at that stage [in order] to determine the scope of the Sixth Amendment right to counsel, and the type of warnings and procedures that should be required before a waiver of that right will be recognized.

*Patterson v. New York*, 487 U.S. 285, 298 (1988), quoted in *Charria*, 919 F.2d at 848. Under the view espoused by the government, this language must also be treated as meaningless and unnecessary, since, as the government would have it, *Miranda* warnings "standing alone" are sufficient, under all circumstances, to ensure an informed waiver. *See* GM, p. 25. If that view were correct, the "stage of the proceedings" would have no bearing whatsoever on the "type of warnings and procedures that should be required." The government's contention that *Miranda* warnings, in and of themselves, tell a defendant all he needs to know to be able to execute an intelligent waiver is completely at odds with the notion that the "type of warnings and procedures that should be required" depends on the procedural context in which a defendant is being questioned.

Honorable Laura Taylor Swain
January 28, 2008
Page 7

In the present case, of course, Noorzai had no idea about the "stage of the proceedings" in which he was being questioned. Indeed, as a consequence of the government agents' deliberate efforts to keep him from knowing even that he was under arrest, he did not know that there were "proceedings" against him at all, or that the agents with whom he was conversing were in fact acting in a law enforcement capacity. Despite the government's tortured effort to suggest that these circumstances are irrelevant to a determination whether his waiver of the right to counsel was made knowingly and intelligently, this Court should readily conclude that, under *Charria*, an understanding, at a minimum, that he was under arrest was a prerequisite to Noorzai's ability to make a knowing waiver of his Sixth Amendment rights.

That conclusion is in no way altered by the Eighth Circuit's holding, in *United States v. Chadwick*, 999 F.2d 1282 (8th Cir. 1993), that a defendant's waiver of the right to counsel, after receiving *Miranda* warnings, was valid even though the defendant was not informed that he had been indicted and the defendant was not under arrest. Although *Chadwick* included *Charria* in a list of cases from other circuits that had held that a waiver given after receiving *Miranda* warnings, but without being advised of an indictment, was knowing and intelligent, 999 F.2d at 1284, the *Chadwick* Court did not discuss the facts of *Charria* or the Second Circuit's express reference to the defendant's "understanding that he is under arrest" as a factor causing him to be "fully apprised of the information needed to make a knowing waiver." 919 F.2d at 848. More to the point, the *Chadwick* Court, unlike this one, was not bound to follow the Second Circuit's holding in *Charria*. Accordingly, notwithstanding the government's urging, GM. 26-27, this Court should recognize that *Chadwick*'s conclusion that the fact that the defendant in that case was not under arrest was not "dispositive" of the waiver issue provides no license for this Court to ignore the Second Circuit's clear holding that an understanding "that he was under arrest," together with *Miranda* warnings, constituted sufficient information to "fully apprise" a defendant of the basic facts essential to a knowing waiver.[1]   Therefore, the Court should conclude that the statements made by Noorzai throughout his stay at the

---

[1] *Chadwick* is also distinguishable because it involved a defendant who, although indicted, was not, in fact, under arrest at the time he was being questioned by a law enforcement officer. Thus, neither in *Chadwick* nor in any other case of which we are aware has a court been confronted with the situation presented by Noorzai's case: the situation in which the defendant was in fact under arrest, but government agents went to great lengths to prevent him from understanding that fact.

Honorable Laura Taylor Swain
January 28, 2008
Page 8

Embassy Suites hotel were obtained in violation of the right to counsel that had attached
upon Noorzai's indictment, and that those statements must therefore be suppressed.[2]

> **D.     An Evidentiary Hearing is Necessary to Determine**
> **Whether the Questioning of Noorzai Following his Formal**
> **Arrest was Preceded by a "Voluntary" Initiation of**
> **Further Discussion and Waiver of Rights by Noorzai and,**
> **if So, Whether the Statements Were the Tainted Fruit of**
> **Prior Illegality**

The government's further claim that the statements made after Noorzai's arrest and
his invocation of the right to counsel are admissible because Noorzai "voluntarily
reinitiated conversation with Agent Hamlette" and was then given fresh *Miranda*
warnings, GM. 28-29, is based solely on Agent Hamlette's as-yet untested factual claims.
Only after an evidentiary hearing will this Court be in a position to determine whether the
resumption of conversation was truly "voluntary" and entirely free of government
prompting. Moreover, even if the Court made such factual findings, it would have to
determine whether, "granting establishment of the primary illegality" – that is, the
questioning of an indicted defendant in the absence of a valid waiver of the right to
counsel discussed in Section C, *supra* – the statements obtained on April 24, 2005, "were
come at by exploitation of that illegality or instead by means sufficiently distinguishable
to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).
The factors relevant to that determination include the temporal proximity of the prior
illegality and the contested statements, the presence of intervening circumstances, and the
purpose and flagrancy of any official misconduct. *Brown v. Illinois*, 422 U.S. 590, 603-

---

[2]In addition to being based on a "fact" that has not yet been tested at an evidentiary
hearing, the government's contention that Noorzai's alleged resumption of conversations on
April 24, 2005, after having been formally advised that he was under arrest, indicates that this
fact was "irrelevant to him" (GM, 27-28) should have no bearing whatsoever on this Court's
waiver analysis. It could just as well be argued that Noorzai's willingness to speak to the agents
at that time demonstrated that the fact that he had the right to remain silent and that anything he
said could be used against him were also "irrelevant" to him. Clearly, however, a suspect's
subjective view of the "relevance" of information does not alter the requirement that a defendant,
in order to make a knowing and intelligent waiver, must be informed of those facts. Similarly,
Noorzai's subjective view of the "relevance" of the fact that he was under arrest does not change
the requirement that, for there to be a knowing and intelligent waiver, it was necessary, at a
minimum, that he be aware of that fact.

Honorable Laura Taylor Swain
January 28, 2008
Page 9

604 (1975).  Particularly in view of the "flagrancy" of the official misconduct in this case – the calculated effort to mislead Noorzai about his status *vis a vis* his interrogators and the purpose of their conversations with him – as well as Noorzai's inability to know that (contrary to the advice he had repeatedly received) the statements he made during the eleven days of questioning at the Embassy Suites Hotel could *not* lawfully be used against him, this Court should conclude, after a hearing, that the April 24th statements, even if not unlawfully obtained in and of themselves, were tainted by the prior illegality.

Respectfully,


/s/
Ivan S. Fisher
*Attorney for Defendant*
*Bashir Noorzai*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,

                            :     Index No. S5 Cr. 19 (LTS)

          Plaintiff      :     **AFFIRMATION OF**
                                    **IVAN S. FISHER**
           v.             :     **IN FURTHER SUPPORT**
                                    **OF DEFENDANT'S**
BASHIR NOORZAI,           :     **MOTION TO DISMISS**
                                    **AND/OR RELEASE**
          Defendant.    :     **HAJI BASHIR NOORZAI**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      **IVAN S. FISHER** affirms under the penalties of perjury the following:

      1.      The information I now share with the court in further support of defendant's motion to dismiss the indictment in this case and/or an order directing the government to uphold its promises to Haji Bashir Noorzai of safe passage to and from the United States comes from discussions with my client, various individuals involved with the American manipulation of the defendant before and after he was indicted, lengthy and detailed discussions with an individual who played a central role in the manipulation of the defendant, as well as voluminous documentation including and not limited to emails between the participants to this massive effort to get the defendant into the United States, contemporaneous reports of their activities distributed to high level officials of the Federal Bureau of Investigation ("FBI"), the Department of Defense ("DOD"), Drug Enforcement Agency ("DEA"), the Central Intelligence Agency ("CIA"), and the Department of Justice ("DOJ").

<u>The Formation of Rosetta</u>

      2.      Sometime in 2003, Michael Patrick Jost and an individual known in this case as "Mike" formed a corporation they called Rosetta Research and Consulting, LLC,

the purpose of which was to develop highly sensitive information regarding the funding of terrorist activities worldwide and to make commercial use of this information by selling it to governments and private entities such as banks, airlines, and securities firms at a profit and to provide consulting and risk management services to mitigate the risk of terrorist activities.  In this regard, Rosetta sought and obtained millions of dollars of investments from various individuals and entities and developed relationships with high levels of officials in the FBI and the DOD including then Secretary of Defense Donald Rumsfeld and then Deputy Secretary of Defense Paul Wolfowitz.  Someone in the Office of the Secretary of Defense collected the names of individuals whom our government believed could provide strategic assistance in interfering with if not destroying methods of funding terrorists and the anti-coalition force in Iraq.  The list of individuals came to be known as "The Kill", "Key Informant List".  Among the individuals on this list was the defendant, Haji Bashir Noorzai.  The concept then in place involved getting individuals working for the United States government to locate and interact with individuals such as Noorzai on the list. These interactions were hoped to lead to these individuals coming to the United States, meeting with appropriate American officials who would then be able to determine the extent to which these individuals were willing and able to assist the United States government in the interdiction of terrorist funding and, in Noorzai's case particularly, to collect substantial amounts of weaponry, especially Stinger missiles in Iraq.  The plan envisioned that assurances would be made and kept to these targeted individuals of safe passage to and from the United States, assurances without which very little could be achieved.

<u>Operation Noorzai</u>

3.      Rosetta began by focusing on Haji Bashir Noorzai (Operation Rosetta).
Beginning in 2003 Rosetta began contacting numbers of officials of foreign governments,
Afghani, Pakistani, and United Arab Emirates whom Rosetta co-opted by bribing them
with wire transfers, cash, Western Union transfers, and gifts, as well as personal services.
The value of these emoluments amounted to hundreds of thousands of dollars at a
minimum.  All of the activities of Rosetta in connection with the operation described
above were reported to officials in the United States through a high level official of the
Federal Bureau of Investigation working in the "Terrorist Finance Operation Section"
(hereinafter "TFOS").  The reports of Rosetta's activities included explicit references to
payments made to foreign officials which were all in violation of American law
forbidding the bribery of foreign public officials.  As a result of payments made to an
Afghani diplomat stationed in London, Rosetta learned of and was introduced to "Bassir"
and through him to Major Saifullah Babur, a former Pakistani intelligence official
("ISI").  "Bassir" and Babur, also paid by Rosetta, ultimately arranged for the
introduction of two Rosetta people, "Mike" and "Brian" to the defendant Noorzai.

4.      In July 2004, "Mike", "Brian", Babur and "Bassir" and an individual
named Haji Bari met with Noorzai in Dubai.  "Mike" and "Brian" held themselves out as
representatives of the United States government and offered Noorzai safe passage to and
from the United States if he were willing to make such a trip to meet other American
officials to discuss proactive cooperation with our government.  The defendant Noorzai
sought and obtained assurances that an individual named Burket who had been paralyzed
on account of an American assault on his home in which his father was killed would be

brought to the United States to receive medical care. The defendant was also promised that Babur and Dad Mohammed, an associate of the defendant, be permitted to travel to the United States with the defendant. This meeting was electronically recorded. A number of meetings followed in August in Dubai and in Peshawar, Pakistan, to the same effect, i.e., the defendant would come to the United States, meet with our officials, discuss and particularize his pro-active cooperation with the American government, and be free to return. The defendant was repeatedly assured by "Mike" and "Brian" that if he came to the United States he would not be arrested.

5.     "Mike" and "Brian" reported relatively contemporaneously to the FBI official at TFOS by email and that individual forwarded their reports to others in the FBI and in the DOD. These reports included references to the promises made to the defendant regarding safe passage. In addition, "Mike" was paying FBI officials for Rosetta's use particularly for FBI information then forwarded by "Mike" to the DOD. At all times during these events leading to the defendant's capture, "Mike" was paid by the DOD.

6.     After a delay of a number of months in which the various United States government agencies involved in this operation began to disagree about its future, there was a meeting held in offices in Washington, D.C., attended by Assistant United States Attorney Boyd Johnson III and Special Agents Jim Hunt, Paul Crain, John Austin and Patrick Hamlette (the case agent of this prosecution), and the Rosetta people represented by Mr. Jost, "Mike" and "Brian". At this meeting the Rosetta people presented a booklet summarizing Rosetta's interactions with the defendant, the promises that had been conveyed by them to him, the fact that the FBI (National Security Law Section) had been

consulted regarding the making of these promises, the pros and cons of the operation going forward, and an intense discussion about whether or not the promises of safe passage previously and frequently pressed upon the defendant would now be kept. No agreement was reached at this meeting. On the contrary and, indeed, while the Rosetta people urged the promises be kept, the DEA agents and the prosecutor very much opposed that position. The Rosetta people presented numerous arguments in support of its position while the others at the meeting simply rejected the notion of passing up the opportunity of arresting Noorzai if and when he came to the United States. During the meeting the Rosetta people were informed that the defendant had in fact already been indicted.

       7.     After the meeting, efforts were made to "put Humpty Dumpty back together again". Logistics were discussed between Rosetta people and the DEA and, at the same time (February, March and April of 2005), the defendant was being constantly reassured that the promises that had been made would be honored by the higher level United States government officials with whom "Mike" and "Brian" were then meeting and to whom "Mike" and "Brian" had been reporting. "Brian" emailed Major Babur and "Bassir" asking them to communicate to the defendant that the promises that had been made to him in Pakistan and Dujbai were in place and would be honored.

       8.     Ultimately, for reasons related in part in the accompanying affidavit of Michael Patrick Jost dated today an investigation of Operation Rosetta was commenced by the Inspector General's Office of the Department of Justice in 2006. Mr. Jost's affidavit particularizes certain aspects of this investigation and strongly corroborates the assertions made here with regard to the bribing of foreign public officials, indeed, even

the bribing of FBI personnel.  Also, Mr. Jost affirms under oath the accuracy of what I

have presented here to the extent covered by his own knowledge.

<u>This Litigation</u>

9.      After our filing, the motion to direct the government to release Noorzai

and dismiss the indictment, the government responded that the promises made to the

defendant in Dubai and Pakistan were not authorized.  "Assuming, arguendo, that these

promises were extended to Noorzai, and that "Mike" and "Brian" held themselves out to

be federal agents, *they were simply not legally authorized to bind the government to such*

*promises*, regardless of what Noorzai believed." (Emphasis added) (See page 32, lines

17-20) "*Here, Noorzai has not and cannot allege that any prosecutor made any promise*

*to him*, and the general assurances he claims the CSs made to him were clearly not in the

context of any plea negotiations." (Emphasis added.)  (See, p. 38, lines 1-3.)  The

government maintains to the court that even if allegations the defendant made in his first

submission were accurate, the relief sought was not warranted *because the promises were*

*not authorized*.  (Emphasis added)  The statements made to this court by the government

were inaccurate and it knew it.

10.      Subsequent to our filing of the original motions I began a series of

interactions with Patrick Jost, "Mike's" partner in Rosetta, and received substantial

documentation corroborating what he told me and some of which I have presented above.

Based on what I have learned from these documents and Mr. Jost, the promises made to

defendant Noorzai upon which he relied when he agreed to come to this country had been

authorized by the highest levels of our government within the Federal Bureau of

Investigation, the Department of Defense, the Department of Justice, including the United

States Attorney's Office for the Southern District of New York, as well as "Main Justice" in Washington. In the months preceding the defendant's fateful trip to New York, I am informed that Mr. Jost was told that the Acting United States Attorney for the Southern District of New York, David Kelly, were, amongst others, involved in the decision to proceed with the "lure" of safe passage, made to an indicted defendant entitled to counsel by virtue of that fact, by falsely holding out the promise of non arrest in return for the defendant's coming to our country. The government has maintained and now still maintains that no prosecutor from the Southern District approved of this conduct. The information I have obtained indicates to the contrary.

11.     In its sur reply, the government now maintains not that the promises were unauthorized but, instead, that even if they were authorized the defendant is not entitled to the relief he seeks. As the accompanying Memorandum of Law makes clear, due process has been violated to the extent that the totality of government misconduct in this case rises regrettably to a level that must shock the conscience of this court. Representatives of our government made promises to an indicted defendant who had no counsel, no knowledge of his indictment, expressed his desire to work for the United States in a place and at a time when this country sorely needed the assistance of the leader of a tribe with some one million people strategically posited in the very areas where our national interests are now so threatened. The government managed to reach the defendant only by bribing numbers of foreign government officials violating explicit United States law and who, when held to account for their conduct, submitted papers to this court making assertions that were false. If what I have set out here has occurred, it is, indeed, shocking.

12.     What I have set out above in this affirmation does not relate all that I have learned from the individuals and sources described at the beginning of this affirmation.  It is the purpose of this affirmation to demonstrate to the court why a hearing must be held with regard to the factual and legal issues raised by our submissions.

IVAN S. FISHER

I returned his call and he asked me when I could come in. I told him to say I need to know where I stand as a target until he confirmed that I was not a target of the investigation.

I had NUMEROUS meetings with them in April and May of 2006, and the investigation resurfaced in late October 2006. At some of the meetings I was accompanied by Harry A. Huge, Esq., who had been the chairman of Rosetta's board. When he was not available, I would confer by phone either with him or Chip Robertson, Esq., who had also been on Rosetta's board.

The law firm was working in conjunction with the Attorney Mike Battle. By the time I left Johnson thought I was.

The investigation focused only on Rosetta, they said, but they Faisel and a nurse aware that the law firm of Motley Rice, a Rosetta investor, was in touch with the OIG regarding emails.

They said that the investigation began because an FBI official with whom "Mike" had regularly interacted during the Rosetta account (hereinafter referred to as "the FBI agent") had been nominated for the Attorney General's award because of his participation in the Haji Bashir Noorzai operation by Karen Tandy.

They showed me a wide range of documents they had already collected, including emails, Rosetta field reports, bank records, and telephone toll records. They also asked me about various individuals by name.

Their review of the bank records uncovered financial irregularities: "the FBI agent" received money from and sent money to Rosetta. They asked me about this and I advised that I didn't know.

They asked me to call "the FBI agent" for an explanation and this call was taped. "the FBI agent" stated that he loaned money to "Mike" and "Brian" while waiting for the Department of Defense and FBI officials to arrive in Dubai to meet with Haji Bashir Noorzai. He said he sent the money, and that Rosetta repaid it. He also stated he did this in consultation with his superiors at the FBI.

[illegible line]

They wanted to know about the Rosetta FBI relationship. I told them "the FBI agent", Mike", and "Brian" had also told me that Rosetta had been "designated as an FBI undercover operation"

They wanted to know about the Rosetta FBI contract negotiations. I told them that Rosetta had decided to start charging the FBI. An issue is that several senior FBI people had agreed to put Rosetta under contract (not just "the FBI agent", but "the FBI agent" was very much at the center of the contract talks on the FBI's side).

[illegible faded paragraph]

They did ask about the involvement of the FBI contracting people and I told them I knew that Spike Bowman and others had participated in the discussions regarding a Rosetta contract. I also advised them that, during the course of the investigation, that Rosetta's counsel met with various senior FBI officials including John Pistole.

They wanted to know about "John S" (an FBI employee). "John S" had been looking up information in FBI databases and forwarding it to Rosetta. I told them I believed that "John S" had been doing this for "Mike" not just for his DoD missions but to provide information to placate investors.

I said I know that "John S" received a "house hunting" trip in anticipation of being hired by Rosetta. I was under the impression, based on comments made by the OIG personnel, that "John S" also received money from Rosetta.

They wanted to know about Georgette Husham (maybe Hachem). I did not know who she was. The OIG personnel said she was paid a lot of money by "Mike" and applied for a job as an FBI Special Agent. She was in communication by e-mail with "the FBI agent" and "John S". I advised that I did not have any of those emails.

The OIG also wanted to get into Rosetta's emails, and we had given them everything. Finally, they wanted certain internal government email. They confirmed that some exists, but they wanted more. I had to explain that the only way to have it would be if an email message were forwarded or copied. They came back on this in October 2006 and were told the same thing.

They OIG wanted additional Rosetta financial information. I explained that "Mike" controlled the Rosetta account, and that I did not have access to it. I also explained that financial reports had been prepared sporadically and distributed to investors who demanded them.

I explained that some of the payments they had identified as being of interest were to "Kifah" in Afghanistan for providing lunch and other lodging, and introduction to other people, such as "Haji" and "Wali Karzai" and to Maja Saddiq. Payments to others were simply introductions.

Keith Bonnano seemed particularly interested in Haji Bashir Noorzai; he wanted to know how Rosetta had gained access to him. In fact, a great deal of my discussions with the OIG (not just with Bonnano) seemed to detail with Noorzai.

There were other payments recorded on the Rosetta bank statements, that I believe represented to other government officials in Afghanistan and Pakistan. It was apparent that large amounts of money (possibly millions of dollars) had been sent to Peshawar, but I could not provide details.

The OIG personnel were puzzled about the "promise/non promise situation" and I advised them it was my understanding that Haji Bashir Noorzai had been told he would not be arrested if he came to the US to meet with senior officials regarding cooperation in reducing the flow of arms to anti coalition forces. They said this seemed to be a Department of Defense issue, and I advised that they should speak to State Placel in the Office of the Secretary of Defense about that.

The OIG advised that they called Paul Crane (who ended up as head of the DC DEA Office) to check the "Hbona" story, but I don't know the details of their conversation.

"Mike" and "Brian" spoke to them much later, I think in August of 2006. The

I certify that the statements made by me on this page are complete, accurate

_____
Michael Patrick Jost

_____
Notary Public

I, Michael Patrick Jost being duly sworn deposes and says:

On March 2, 2005, I received two emails from "Brian". "Brian" stated that there were delays in obtaining dates for the Haji Bashir Noorzai operation. "Brian" stated that "Mike" had been in touch with Assistant U.S. Attorney Boyd Johnson, who was still optimistic about being able to execute the operation in Dubai, but who was unable to provide dates. Based on this information, "Brian" advised he would be going to Florida to visit his parents.

On March 14, 2005, I received an email from "Brian" stating that he had returned from Florida, and that he was in touch with DEA Special Agent Paul Craine regarding the Haji Bashir Noorzai operation.

On March 22, 2005, I received an email from "Brian" stating that from then on, operational security would apply with respect to the Haji Bashir Noorzai operation, that is, no one would be talking about it.

On March 22, 2005, I received another email from "Brian" stating that the "SARC" (which I understood to be a panel within the Department of Justice) had given its final approval for the Haji Bashir Noorzai operation, including the use of a "lure", which had apparently been the source of much of the delay in getting the approval for the operation.

On March 24, 2005, I received an email from "Brian" stating that all that remained was obtaining the approval of DEA Administrator Karen Tandy, and, once that was obtained, the operation would commence.

On April 2, 2005, I sent "Brian" an email expressing my condolences on the passing of Pope John Paul II. Due to operational security, I did not expect a prompt reply (Brian was in Dubai at this time executing the Haji Bashir Noorzai operation).

On April 3, 2005, I received an email from "Brian" thanking me for the email regarding Pope John Paul II.

At about this time, I received an early morning phone call from "Brian". He indicated that there could be a delay of up to a week as Haji Bashir Noorzai's mother was ill, and that Noorzai was delaying his departure for Dubai.

"Brian" said that it was necessary to reassure Noorzai that everything was still fine, specifically that the promises were still valid, and that he had done so. If this had not been done, it is likely that Noorzai would not have come to Dubai.

_____
Michael Patrick Jost

City/County of _____
Commonwealth of Virginia
The foregoing instrument was acknowledged
before me this ____ day of _____ 20____
by _____
(Name of person seeking acknowledgment)
_____
Notary Public
Commission No. _____ Notary Registration # _____

YU-FANG KO
COMM. EXP 07/31/2011
NOTARY PUBLIC
# 7126775
COMMONWEALTH OF VIRGINIA